tion gives its own definition of the word "hotel" as used in it. Such definition is to be found in section 30, where it is declared as follows:

"The term 'hotel' as used in this chapter shall mean a building regularly used and kept open as such for the feeding and lodging of guests, where all who conduct themselves properly and who are able and ready to pay for their entertainment, are received if there be accommodations for them, and who, without any stipulated engagement as to the duration of their stay, or as to the rate of compensation, are, while there, supplied, at a reasonable charge, with their meals, lodgings, refreshment and such service and attention as are necessarily incident to the use of the place as a temporary home," etc.

The testimony of Conklin was that he had discontinued such business and confined himself to that of ordinary traffic in liquors, and the proofs to the contrary do not show, as before stated, any regular conduct of a hotel business in connection with the certificate of 1910. The statute did not provide that Conklin could not change the character of his business in said premises without the consent of the owners of the premises. Therefore when Conklin filed his notice of abandonment in May, 1911, the premises of the defendants Dittmann were not used as "a hotel" in the meaning of the statute, apart from the fact that they were practically torn apart by the defendants and incapable of any such use through their own deliberate conduct, and his said notice was not ineffective because they did not join in it by executing and acknowledging it.

The seventh and fifteenth findings of fact made by the trial court are reversed, and the judgment dismissing the complaint with costs is reversed, with costs, and judgment is awarded to the plaintiff, with costs, as provided in section 1317 of the Code of Civil Procedure. All concur.

---

(155 App. Div. 246.)　　　　In re BUCHLER.

(Supreme Court, Appellate Division, First Department. February 21, 1913.)

1. ATTORNEY AND CLIENT (§ 53*)—DISBARMENT—EVIDENCE.

In a proceeding to discipline an attorney, evidence *held* to show a misappropriation of funds belonging to his clients.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 74, 75; Dec. Dig. § 53.*]

2. ATTORNEY AND CLIENT (§ 44*)—OFFENSES—DISCIPLINE.

An attorney *held* properly disciplined, by suspension for one year, for misappropriation of his clients' money occurring five years previous when he was only 25 years old and had been only three years at the bar, though no new complaints had been made and the charges were not made until four years after the offense.

[Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 55, 56, 62; Dec. Dig. § 44.*]

In the matter of William Paul Buchler, an attorney. Application to discipline respondent upon the report of the official referee. Respondent suspended.

See, also, 152 App. Div. 885, 136 N. Y. Supp. 1132.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-LIN, CLARKE, and SCOTT, JJ.

Einar Chrystie, of New York City, for petitioner.

George Gordon Battle, of New York City, for respondent.

INGRAHAM, P. J. [1] There were two charges against the respondent. The first related to his receipt of a sum of money in settlement of a claim for damages for the death of one Edmund Hoffner. The respondent obtained the appointment of an administrator and thereafter commenced an action in his name which was on May 29, 1907, settled by permission of the surrogate for $200 which was paid to the respondent. In addition to this $200, the respondent obtained from the parents of the deceased the sum of $100 to pay an undertaker's bill. The respondent therefore had in his hands $300 belonging to his client. The referee reports that the respondent used this money for his own purposes. The undertaker's bill was just $100, and he, having been referred by the deceased's parents to the respondent, demanded payment from the respondent. The respondent admitted to him that he had received the money, but refused to pay it because it might prejudice his suit to recover for the death of the deceased. The respondent says he spent $10 to obtain a copy of the stenographer's minutes at the coroner's inquest and finally after considerable delay and repeated requests of the undertaker he persuaded the undertaker to settle for $90. He then gave the undertaker two checks, one dated June 15, 1907, and one dated July 9, 1907. The second check was returned by the bank unpaid on the ground that there were not sufficient funds in the bank to pay this amount, and the check was not paid until July 26, 1907. In the meantime it seems the respondent had received the $200 in settlement of the action. Out of that amount, under his agreement, he was entitled to $100. As his bank account was not good for the second check given to the undertaker on July 9, 1907, he must have used this $100 as well as the $100 given for the undertaker's bill. His client did not get this $100 until October 4th, when it was paid.

The second charge was for collecting and appropriating certain moneys for another client named Morris Kopfstein. It seems that on account of this client the respondent received $613.95 on January 31, 1907. He sent $400 of this to Kopfstein and retained $213.95 for his fees and disbursements without, however, giving any items. This was strenuously objected to by Kopfstein. He had another claim for Kopfstein against the Broads Manufacturing Company, on which on February 21, 1907, he received $180.61 and on March 8th the further sum of $301.85, making a total of $482.46. He suppressed from his client the fact that he had collected this sum of money, made a false statement to his client that the money had not been received, and undoubtedly appropriated that money to his own use. On May 10, 1907, the respondent gave Kopfstein his 30-day note for $600. The understanding at the time of giving this note was that before its maturity the money due from this company would be collected and would be used by the respondent, together with $213.95 already

in his hands, to take up the note. On June 10, 1907, months after the money had been collected, but when the note became due a renewal note in like amount was accepted by Kopfstein which would become due on October 10, 1907. This note was received under the same arrangement, that the money from this manufacturing company would be collected in the meantime. Subsequently the respondent requested Kopfstein to get his note for $400 discounted as an accommodation note, but that Kopfstein refused to do; he having ascertained that the first note for $600 would not be paid. Finally in October, 1907, the respondent made a settlement with Kopfstein. The $600 note due October 10th was surrendered, and it was agreed that there was a balance of $300 in favor of Kopfstein. This result was reached upon the statement that the respondent had received from the manufacturing company only $456. The respondent, however, failed to pay this balance, and in November, 1907, there was a proceeding to compel the respondent to pay that amount, which finally resulted in a stipulation by which the $300 was to be paid in installments.

The testimony of the respondent before the referee was not at all satisfactory. He contradicted his client in many particulars, and the referee has found that his testimony was not true. The respondent seems to think it is a defense to the charges that the events took place in 1907 at a time when the respondent says he was 25 years of age and admitted only three years. He states that for these reasons these charges are stale, have been dragged by malice out of the forgotten past, and that the respondent has since been practicing his profession with success and without criticism and in good repute. He then proceeds to claim that there is no evidence that he intentionally used his clients' money; that he carelessly overdrew his account, and thus temporarily and inadvertently used his clients' money; and that this would not justify discipline. He also claims that the fact that he gave the undertaker a bad check did not indicate that he had used his client's money, but his money might have been kept by him in the safe, which even the respondent does not claim.

The conclusion of the referee as to the second charge is then attacked, but there seems to be no reason for doubt of the correctness of the referee's conclusion.

[2] We accept the report of the referee. The question is then presented as to what discipline we should impose. There is no evidence as to the respondent's character for the five years since this offense was committed, but still the charges were not made until four years after the offense, and so far as appears there are no other charges against the respondent. The court cannot, however, overlook the offense committed and the conduct of the respondent before the referee, and the conclusion is that, in view of all the circumstances, the respondent should be suspended from practice for one year and until the further order of this court, with leave to apply for reinstatement at the expiration of said period, upon proof that he has actually abstained from practice during that period and has otherwise properly conducted himself. All concur.